## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOSHUA DUVALL | ) | CASE NO.: 19-11272(1)(12) |
| BRANDI DUVALL | ) | |
| NATHAN DUVALL | ) | |
| JAIME DUVALL | ) | Administratively Consolidated |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| FARM CREDIT MID-AMERICA, PCA | ) | ADV. PRO. NO.  20-01009 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA DUVALL | ) | |
| BRANDI DUVALL | ) | |
| NATHAN DUVALL | ) | |
| JAIME DUVALL | ) | |
| | ) | |
| Defendant(s) | ) | |

### <u>MEMORANDUM-OPINION</u>

This matter is before the Court on the Complaint of Plaintiff Farm Credit Mid-America, PCA ("Farm Credit") to Determine Indebtedness Non-Dischargeable against Defendants/Debtors Joshua Duvall, Brandi Duvall, Nathan Duvall and Jaime Duvall (collectively "Debtors" or "Duvalls").  The Court considered the testimony of the witnesses at the trial on the matter, the exhibits ruled admissible at trial, and the post-trial briefs filed by the parties.  For the following reasons, the Court will enter Judgment in favor of the Debtors.

## INTRODUCTION

Farm Credit initiated this action against the Debtors to have two loans in the amount of $1,054,959.70 and $283,396.91, that it made to the Debtors declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. § 523(a)(6).

Debtor Joshua Duvall and Debtor Nathan Duvall are brothers who operated a farm growing row crops such as wheat, corn and soybeans.  Debtors also raised beef cattle on the farm.

Debtor Brandi Duvall is the Warren County Circuit Court Clerk and is married to Debtor Joshua Duvall.  Debtor Jaime Duvall is a nurse practitioner and is married to Debtor Nathan Duvall.

## FACTS

In the spring of 2017, the Duvalls had several loans with Farm Credit that were reaching maturity.  The Duvalls tried to obtain financing from other banks in order to pay off Farm Credit, but were unsuccessful.  Therefore, the Duvalls made an agreement with Farm Credit for the refinancing of the Farm Credit loans.  In order to obtain liens on the Duvalls' property, prior loans from Security Seed and Chemical, Inc. ("Security Seed"), which held first liens on the Duvalls' farm and equipment, had to be paid off.  Thus, Farm Credit loaned the Duvalls $200,000.00 which was used to pay off the liens of Security Seed.

Farm Credit then entered into the two loans with the Duvalls that are the subject of this nondischargeability action.  The first was a Commercial Line of Credit Agreement and Note in the original principal amount of $925,000.00, executed by all four of the Debtors in favor of Farm Credit on May 4, 2017, referred to herein as "Note 0000."

The second was a Commercial Line of Credit Agreement and Note in the original principal amount of $594,652.04, executed by each of the Debtors on May 4, 2017, referred to herein as "Note 5100."

Both Note 0000 and Note 5100 listed the same collateral as security for the loans. In order to perfect its security interest in the listed collateral, Farm Credit filed and recorded UCC Financing Statements with the Kentucky Secretary of State on January 9, 2015 and February 9, 2016, respectively, as well as a Continuation Statement recorded on December 27, 2019.

Farm Credit estimates, at the time of the filing of its post-trial brief, that with the inclusion of late fees and interest, $1,054,959.70 is owed on Note 0000 and $283,396.91 on Note 5100.

Farm Credit states that due to the Duvalls deteriorating financial condition, the two loans would only be granted to the Duvalls if the terms of the loans contained certain additional restrictive terms. These included the following:

BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS

Additional Covenant. Customers are restricted from making aggregate capital purchases exceeding $100,000.00 without prior consent from FCMA–Customers are restricted from any new financing from other lenders.

Additional Covenant. To furnish the Lender by January 15 financial statements consisting of a written signed balance sheet as of the close of Borrower's fiscal year-end and a written statement of profit and loss for the period.

Additional Covenant. No loan proceeds may be used for capital investments. For purposes of this covenant, capital investment shall mean the acquisition of land or fixed tangible assets capable of being depreciated under the Federal Internal Revenue Code.

*See* Plaintiffs' Trial Exhibits No. 1 at p. 3 and No. 4 at p. 3. Farm Credit contends the Duvalls violated the first and third Additional Covenants multiple times.

After May 4, 2017, the Duvalls purchased, with secured financing from sources other than Farm Credit, six different pieces of real estate.  *See* Plaintiff's trial Exhibit 46 for a listing of these properties.  Joshua and Brandi Duvall purchased five of the six properties separately and one piece was purchased by all four of the Duvalls.  All six transactions resulted in liens being placed on the property by Citizens First Bank, South Central Bank and several banks other than Farm Credit.

In addition to these transactions which Farm Credit states violated the terms of their loans with Farm Credit, Nathan and Joshua Duvall purchased several pieces of farm equipment from Wright Implement & John Deere Financial.  These loans totaled approximately $183,000.00 as evidenced by the Proofs of Claim filed in the bankruptcy cases by John Deere Financial.

It was clear in the spring of 2017 that the Duvalls were unable to pay their bills as they became due.  Although they attempted unsuccessfully to obtain financing from other banks in order to pay off Farm Credit, faced with having to cease their farming operations, the Duvalls reluctantly refinanced their loans with Farm Credit.  Farm Credit contends it purposely included the Additional Covenants and would not have made the loans without these restrictive terms.  Farm Credit was well aware that the Duvalls had sought refinancing from other banks, but acknowledged that they wanted to help the Duvalls continue their farming operations in order to have their own loans repaid.  The refinancing with Farm Credit allowed the Duvalls to pay off the Security Seed lien and go forward with planting their 2017 crops.

Farm Credit contends that the Duvalls were aware of the meaning of the liens that secured their loans.  Debtors testified that they identified the places where they planned to sell their crops so that Farm Credit could notify these places and have Farm Credit's name placed jointly with the Debtors' names on any checks for crops sold.  Despite these facts, Debtors sold wheat and soybeans

-4-

in 2017 and 2018 to Gavilon, a company not previously identified by the Duvalls to Farm Credit. Thus, any checks issued for crops sold to Gavilon did not have Farm Credit's name listed on them. Joshua Duvall testified that the reason he sold the crops to Gavilon was because it paid the most money for the crops, not because he was trying to avoid Farm Credit's lien.

Farm Credit contends the above facts evidence that the Debtors knowingly violated the terms of the Additional Covenants and that they would not have entered into these loans with the Debtors had they known this was their intent. According to Farm Credit, these facts support findings in its favor declaring the debts owed to it nondischargeable under 11 U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. § 523(a)(6).

Farm Credit was well aware of the Duvalls financial difficulties at the time of the refinance. Emily Pike, the Farm Credit Special Accounts Officer testified that Farm Credit was aware of prior breaches of loan covenants, but despite these concerns, Farm Credit wanted the Duvalls' farm operation to keep operating. This was so even though Farm Credit had expected a $1,000,000.00 pay down on their current loan from the crops sales which had not materialized. Farm Credit expressed its desire to make the Duvalls' farming operation work and knew that they needed the loans restructured.

Amanda Shaff, Vice President Retail Operations at Farm Credit worked on the Duvall account in 2017. She also knew that the Duvalls were working on refinancing with another bank. When it became clear this would not happen, Farm Credit decided to help the Duvalls by making an agreement for the new loans, as well as the $200,000.00 loan in order to pay off Security Seed. Farm Credit realized that if this did not happen, the Duvalls would no longer be able to operate the farm. Farm Credit had concerns at that time as to future repayment by the Duvalls. Despite these

-5-

concerns, Farm Credit entered into the two loans with the Duvalls because they wanted to keep the Duvalls in business.

Farm Credit knew at the time the two loans at issue were made that the Duvalls needed the loans in order to get their 2017 crops into the ground. If there were no crops, Farm Credit would have to take a loss on their loans. Although the Duvalls sold some of the crops to entities not listed as one of the entities where the checks would be issued jointly, Farm Credit knew when the crops were harvested, as both Pike and Shaff were very familiar with farming operations, having either grown up on farms or currently live on farms. The Duvalls testified that they used some of their corn crop as silage to feed their livestock. Farm Credit was aware that the Duvalls needed the corn for this purpose. Farm Credit was also aware that the Duvalls had working capital of approximately $258,000.00, which was far less than needed to operate the farm. All of these facts were known to Farm Credit at the time the loans were entered into and were not hidden by the Duvalls.

As part of Farm Credit's claim under 11 U.S.C. § 523(a)(6), Farm Credit claims that initially, the Debtors' farmed as individuals. However, some time after entering into the two loans at issue the Debtors created an entity called "D & D Farms" for future farming operations. Debtors were prohibited from conducting farming operations under a new name per the terms of the loan documents. *See* Warranties section of the Agreement. Prior to the formation of D & D Farms, the Debtors had always farmed under their individual names.

Debtors contend that there is insufficient proof of each of the Debtors' intent to defraud Farm Credit to have the debt declared nondischargeable under either 11 U.S.C. § 523(a)(2)(A) or that their actions were willful and malicious to meet the requirements of 11 U.S.C. § 523(a)(6). Instead,

Debtors acknowledge that their actions amounted to breach of contract of the loan documents but nothing more.

## **LEGAL ANALYSIS**

A.  Nondischargeability Claim Under 11 U.S.C. § 523(a)(2)(A).

Farm Credit claims Debtors' actions in connection with the two loans at issue should be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A).  This statute provides, in pertinent part, as follows:

> Exceptions to Discharge
>
> (a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
> . . . . .
> (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

In order to have a debt excepted from discharge under this section of the Bankruptcy Code, Farm Credit had to prove the following elements by a preponderance of the evidence:

> (1) The debtor obtained money through a material misrepresentation, that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
> (2) The debtor intended to deceive the creditor;
> (3) The creditor justifiably relied on the false representation; and
> (4) Its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998).

The court in *Rembert* specifically stated that under § 523(a)(2)(A) there must be a showing of actual

or "positive fraud, not merely fraud implied by law . . .." *Id.* (quoting *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285-86 (9th Cir. 1996)).  "Thus, we hold that the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt." *Rembert*, 141 F.3d at 281.

The Sixth Circuit Bankruptcy Appellate Panel made clear that "actual fraud" under 11 U.S.C. § 523(a)(2)(A) is broader than a misrepresentation and encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Mellow Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).  It requires intent to deceive or defraud.  *Id.*

There is a complete lack of proof as to any fraudulent intent on the part of the Duvall wives, Brandi and Jaime Duvall, as they had no involvement with the transaction, other than to sign the loan documents.  Both of the Duvall wives have careers outside of the farm and had no involvement in the farming operations.  Both testified that they signed the loan documents at the request of their husbands, that they had no involvement with the farming operation and did so because Farm Credit required their signatures.

As to Joshua and Nathan Duvall, Farm Credit was well aware that the Duvalls were trying to obtain loans with other banks in order to refinance their operations.  Farm Credit was also well aware of their financial difficulties that existed at the time of the refinance.  Emily Pike, the Farm Credit special accounts officer, testified that Farm Credit was aware of prior breaches of loan covenants but despite these concerns, Farm Credit wanted the Duvalls' farming operations to continue operating.  This was so even though Farm Credit had expected a $1 million paydown on their current loan from crop sales which had not materialized.  Farm Credit knew the Duvalls needed

the loans restructured and its representatives testified that their actions were taken to keep the Duvalls' farm operating.

Farm Credit's claim under 11 U.S.C. § 523(a)(2)(A) is dependent on a showing of actual fraud by the Debtors. There was no proof that the Duvalls obtained the loan from Farm Credit through material misrepresentations or gross recklessness. There also is no proof the Debtors intended to deceive Farm Credit as to repaying the loan. Both Joshua and Nathan presented as credible witnesses and testified that they did not intend to defraud Farm Credit. Farm Credit was well aware that the Debtors were unable to obtain funding from any other bank, as well as the presence of prior existing liens. The Debtors were truthful as to their precarious financial position at the time they decided to refinance their loans with Farm Credit. Farm Credit knew it did not have to enter these loans. It could have declared a default and proceeded with liquidation of the Debtors' assets. Instead, Farm Credit indicated it wanted the Duvalls' operation to continue in business because it believed they would be successful and able to repay the loans. The evidence of actual fraud by the Debtors is totally lacking and will not support a nondischargeability claim under 11 U.S.C. § 523(a)(2)(A).

Farm Credit relies on an unpublished opinion from this Court, *Campbell v. Butz (In re Butz)* 2019 WL 1980701 (W.D. Ky. 2018), in support of its claim under 11 U.S.C. § 523(a)(2)(A). The *Butz* Opinion states the basic principle that "fraudulent intent may be proven by course of conduct or circumstantial evidence," citing *Allen v. Smith (In re Smith)*, 567 B.R. 529 (Bankr. M.D. Tenn. 2017). This Court held the debt at issue in *Butz* nondischargeable under 11 U.S.C. § 523(a)(2)(A). However, the facts in *Butz* that led this Court to that conclusion are vastly different from those before the Court. In *Butz* the debtors used funds loaned to them from family members to start a business

selling flip flops in Hawaii.  However, the funds loaned were used by the debtors for extravagant living expenses instead, such as lengthy stays at Trump Towers, a $30,000 summer camp for their son and thousands of dollars spent on lavish personal items.

The funds at issue in this case were used, albeit unsuccessfully, for the very purpose for which Farm Credit loaned the funds.  The fact the Debtors could not timely repay the funds to Farm Credit was not because the Debtors committed actual fraud, but rather that the farming efforts were unsuccessful.  The facts here, unlike those in the *Butz* case, do not support a finding of nondischargeability under 11 U.S.C. § 523(a)(2)(A).

The Court notes that Farm Credit cited to two other unpublished Opinions from this Court and one unpublished Opinion from another Judge from this District.  Counsel recognizes in a footnote that the Opinions are not cited for their precedential value, yet clearly uses the Court's conclusions in support of Farm Credit's claims.  It should be noted that this Court is well aware of all of its own Opinions, published or unpublished, having listened to evidence and arguments presented at a trial on the merits in each.  Precedent is often quite helpful, but each case presents unique facts and personalities (credible and not so credible at times) and every decision is determined by the testimony and documentary evidence  presented and the applicable law.  This Court is not absolutely bound by its prior Opinions, rather it is guided by the testimony and credibility of the witnesses, and how the applicable law relates to the unique facts of each case.

There is no evidence that when the loans were entered into, that Debtors intended to defraud Farm Credit or that they had no intention of ever repaying Farm Credit.  In fact, the Duvalls were attempting to refinance the debt owed to Farm Credit with another bank in order to pay off Farm Credit.  This was always Debtors' intent and there is no proof to the contrary that Debtors had no

intention of repaying Farm Credit. Farm Credit was well aware, based on is long history with Debtors that they were struggling to repay the 2016 obligations. Instead, Farm Credit continued doing business with the Debtors and refinanced the loans largely because it needed the Debtors to succeed, a goal common in agricultural lending. Under 11 U.S.C. § 523(a)(2)(A), in order to establish the underlying debt nondischargeable, there must be a showing of "moral turpitude or intentional wrongdoing." *Husky Int'l. Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016). There is no evidence the loans herein were obtained by actual fraud or that any action by the Debtors subsequent to issuance of the loans amounts to anything more than breach of contract, not actual fraud. Accordingly, the claim for nondischargeability under 11 U.S.C. § 523(a)(2)(A) must be denied.

Farm Credit contends that Debtors' breached the Additional Covenants after entering into the two loans by purchasing several pieces of real estate with secured financing and several pieces of farm equipment from Nathan Duvalls' employer, Wright Implement. Farm Credit contends that "the totality of the circumstances promptly after the execution of the loan documents showed that the Duvalls had no intention of complying with these Additional Covenants. The Duvalls were going to do just what the Duvalls wanted to do and no Additional Covenants were going to stand in the way." Farm Credit's Post Trial Brief, p. 6.

There is no evidence that the Duvalls entered into these loans with fraudulent intent to specifically fail to repay them and further there was no evidence these purchases and loans caused either the Debtors' operation or Farm Credit harm. No Farm Credit funds were used for the transactions and Farm Credit took no action to declare a default upon learning of the transactions. Furthermore, the testimony at trial supports the finding that while the transactions may have been

a breach of the Additional Covenants, there was no harm to Farm Credit and no fraudulent interest by the Debtors which would support a claim under 11 U.S.C. § 523(1)(2)(A).

Farm Credit was well aware prior to the entry of the loan agreements that the Duvalls had large unpaid balances due. Yet, Farm Credit representatives testified that they made the new loans because they wanted the Duvalls' farming operation to continue and to succeed. There simply is no evidence that the loans were entered into by the Duvalls with the required fraudulent intent to hold them nondischargeable. For this reason, there is no basis to hold the debt nondischargeable under 11 U.S.C. § 523(a)(2)(A).

B. Farm Credit's Claim to Nondischargeability Under 11 U.S.C. § 523(a)(6) Fails for Lack of Evidence.

Farm Credit's next claim for nondischargeability is based on 11 U.S.C. § 523(a)(6) which provides in pertinent part:

> (a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
> . . . . .
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Under § 523(a)(6) a debt resulting from an injury in order to be declared nondischargeable must be both "willful" and "malicious" in order to be excepted from discharge. *In re Berge*, 953 F.3d 907, 914 (6th Cir. 2020).

A "willful" injury stems from the conduct by which a defendant intended "the consequences of an act not simply the act itself." *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). In order to show willfulness, the creditor must demonstrate that the debtor either had a "desire to cause the consequences of his act, or . . . believes that injury was substantially certain to result from it."

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).  This is a subjective standard.  If the defendant did not intend the consequences or was not subjectively aware that the consequences were substantially certain to occur, the actions were not willful.  *In re Boland*, 596 B.R. 532, 545 (B.A.P. 6th Cir. 2019).

Farm Credit bases its 11 U.S.C. § 523(a)(6) claim on conversion.  Farm Credit contends the Duvalls "granted liens in favor of Farm Credit against the collateral expressed in the loan documents; that they were aware of the liens and that they understood how liens work."  Furthermore, the loan documents expressly provide for the lien to attach to the proceeds of the collateral.  Farm Credit alleges that the Duvalls knew that when Farm Credit filed its lien that this would cause joint checks to be issued when the crops were sold to those identified buyers.  The Duvalls sold their wheat and soybean crops in 2017 and 2018 to Gavilon, a party not previously identified as a buyer, because Gavilon offered the highest price for the grains as opposed to South Union which was known to Farm Credit.  Farm Credit claims these actions made the debt nondischargeable under Section 523(a)(6).  Farm Credit states that such action was willful, malicious and done intentionally by the Duvalls to deprive Farm Credit of the proceeds of the collateral that should have been used to repay Farm Credit on its secured debt.

Farm Credit further asserts that between November 15, 2018 and December 17, 2018, the Duvalls deposited $613,652.00 into their "farm account" and paid out $500,195.12 to parties other than Farm Credit.  Also, after entry of the "status quo" order, the Duvalls harvested and sold all of their 2018 wheat crop, harvested all of their 2018 corn crop and either ground the corn or chopped it for silage and used it for feeding the cattle, as well as harvested and sold 300 acres of soybeans–of which none of the proceeds of these sales went to Farm Credit.  Based upon this evidence, Farm

-13-

Credit requests the Court to "infer intent" of Joshua and Nathan Duvall to injure Farm Credit due to their conversion of its collateral.

Debtors do not dispute the essence of these facts. They acknowledge that they received proceeds from the sale of crops and cattle and that they failed to remit these proceeds to Farm Credit. Debtors, however, contend these actions were not "willful and malicious" as required by the statute. Rather, the Duvalls believed they had a strong relationship with Farm Credit. The facts establish that Farm Credit made no inquiry as to where the proceeds of the crops were until May 2018, long after the sales occurred and more than 90 days after the maturity date of the loans. The Farm Credit representatives had farming backgrounds themselves. They knew when the crops were harvested and knew the proceeds were not timely remitted to Farm Credit. Despite knowing these facts, Farm Credit took no action until they filed suit against the Duvalls in November of 2018. The Duvalls informed Farm Credit that the proceeds were put back into the farming operation and indeed there is no evidence the proceeds were used for anything but reinvestment in the farm operation. The Duvalls' intentions and actions were always to keep the farming operation running. Farm Credit acknowledged these facts and that they also were interested in maintaining the operations.

In the *Geiger* case, the Court stated that the word "willful" modifies the word "injury" and in order for it to be nondischargeable, a willful and malicious injury must be "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). This case does not present the factual scenario of a "willful" injury by the Duvalls.

The above facts establish that the Debtors' actions in keeping the proceeds of the crop sales and livestock sales, upon which Farm Credit had a lien constituted conversion. However, as Debtors

further note in their brief, not every conversion constitutes a "willful and malicious" injury under 11 U.S.C. § 523(a)(6), citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934) and *Auto Fin. Corp. v. Leonard (In re Leonard)*, Nos. 11-52028, 11-5073, 2013 Bankr. LEXIS 857, at *14-15 (Bankr. E.D. Tenn. Mar. 8, 2013).

There also is no evidence that Debtors' actions were malicious, as required under 11 U.S.C. § 523(a)(6).  In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934), the debtor sold a vehicle without the secured lender's consent as required by the parties' agreement.  In *Davis*, the court specifically stated,

> There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. . . .There may be an honest but mistaken belief engendered by a course of dealing, that powers have been enlarged or incapacities removed.  In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis*, 293 U.S. at 332.  Joshua Duvall testified that it was not his understanding that not having Farm Credit's name on the proceeds check was a problem.  This was because over the long course of his dealings with Farm Credit, Farm Credit's name was only listed on the sales proceeds checks 30% to 40% of the time and the rest of the time, Farm Credit was not listed on the checks.  Based on the long history and course of dealing between the parties, the Debtors' actions in failing to remit the proceeds of the sales of crops and cattle do not rise to the level of willfulness and maliciousness as required by § 523(a)(6).

Here, the Debtors had a longstanding close relationship with Farm Credit.  Farm Credit was well aware of the Debtors' actions and failed to object to or take any immediate action to prohibit or stop those actions.  Farm Credit's witnesses testified at trial that they were aware of the Debtors' dire circumstances yet acquiesced in their handling of the proceeds.  Debtors' intent with those

actions was always to keep the farm operational and all proceeds were put back into the farming operation. This was necessary for the Debtors to obtain financing from another bank in order to repay Farm Credit. These refinancing efforts failed yet Farm Credit continued to loan the Debtors money in order to keep its operation running. Farm Credit's representatives testified that when they asked long after the crops had been harvested and sold why no payments had been made to Farm Credit or what was done with the proceeds, the Debtors responded honestly that they were put back into the farm. Yet, Farm Credit did not declare a default on this basis even though they claimed these actions violated the terms of the Loan Agreement Additional Covenants. While these actions constitute a breach of contract with Farm Credit, they do not fall within the willful and malicious injury requirements of 11 U.S.C. § 523(a)(6).

Farm Credit also relies on the fact that the Debtors established a new corporation, D & D Farms, to sell their crop proceeds as evidence of their willful and malicious conduct. However, this was simply another attempt by the Debtors to continue their farming operation. A willful injury, under the statute, occurs where the debtor is motivated by a desire to inflict injury. *See Market Graphics Research Grp., Inc. v. Berge (In re Berge)*, 953 F.3d 907, 915 (6th Cir. 2020) (citing *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1990)). There was no evidence presented to establish Debtors' conduct in not remitting the proceeds to Farm Credit was willful, as defined by the statute. Farm Credit was aware of Debtors' efforts to refinance the loan so they could repay Farm Credit. Farm Credit did not take affirmative steps against the Debtors until it filed its collection action against the Debtors, nearly nine months after the loan's maturity date.

There is no evidence that Duvalls' actions were not motivated by a desire to cause Farm Credit injury. The Court was able to assess the credibility of all of the witnesses at trial and did not

-16-

detect any animus necessary to justify a finding of willful and malicious conduct. When Farm Credit found out about the defaults and actions that it contends violated the terms of the Loan Agreement, its failure to take immediate legal action against the Debtors was in line with its prior course of dealing with the Debtors. In other words, Farm Credit's actions established their willingness to allow the Debtors to continue their actions which they hoped would result in the loans being paid. The Debtors' actions prove that this was their intent also. The lack of evidence of willful and malicious injury by the Debtors warrants judgment in favor of the Debtors on the claims of nondischargeability under 11 U.S.C. § 523(a)(6) of Farm Credit.

## <u>CONCLUSION</u>

For all of the above reasons the Court will enter Judgment in favor of the Debtors on the claims of Farm Credit for nondischargeability of its loans under 11 U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. § 523(a)(6).

Joan A. Lloyd
United States Bankruptcy Judge
Dated: May 19, 2022

-17-

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOSHUA DUVALL | ) | CASE NO.: 19-11272(1)(12) |
| BRANDI DUVALL | ) | |
| NATHAN DUVALL | ) | |
| JAIME DUVALL | ) | Administratively Consolidated |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| FARM CREDIT MID-AMERICA, PCA | ) | ADV. PRO. NO.  20-01009 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA DUVALL | ) | |
| BRANDI DUVALL | ) | |
| NATHAN DUVALL | ) | |
| JAIME DUVALL | ) | |
| | ) | |
| Defendant(s) | ) | |

### JUDGMENT

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Judgment is hereby

entered in favor of the Debtors Joshua Duvall, Brandi Duvall, Nathan Duvall and Jaime Duvall on

all claims asserted against them in the Complaint for Nondischargeability of Debts of Farm Credit

Services under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  May 19, 2022